RANDY S. GROSSMAN
Acting United States Attorney
NICOLE E. BREDARIOL
MA Bar: 696484
Special Assistant U.S. Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8419
Email: Nicole.Bredariol@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JORGE JOEL VINCES (2), <br> ROGELIO GALLARDO (3), <br> MODESTO PINEDA PEDRAZA (4) <br> TEDITH GUSTAVO PEREZ-ACUNA (5) <br><br> Defendants. | Case No.: 20-CR-1761- JLS <br><br> **UNITED STATES' OMNIBUS SENTENCING MEMORANDUM AS TO DEFENDANTS 2, 3, 4, AND 5** <br><br> Date: December 3, 2021 <br> Time: 9:00 a.m. |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, Acting United States Attorney, and Nicole E. Bredariol, Special Assistant United States Attorney, hereby files its Sentencing Memorandum as to the following defendants: Defendant 2: Jorge Joel Vinces, Defendant 3: Rogelio Gallardo, Defendant 4: Modesto Pineda Pedraza, and Defendant 5: Tedith Gustavo Perez-Acuna. This memorandum is based upon the files and records of the case.

**I.    INTRODUCTION**

Defendant 2: Jorge Joel Vinces (VINCES), Defendant 3: Rogelio Gallardo (GALLARDO), Defendant 4: Modesto Pineda Pedraza (PEDRAZA), and Defendant 5: Tedith Gustavo Perez-Acuna (PEREZ), (collectively "Defendants") are before the Court for sentencing after pleading guilty to Possession of Cocaine with Intent to Distribute on

Board a Vessel in violation of 46 U.S.C. § 70503. A substantial sentence is warranted here. Maritime cocaine smuggling is complicated. The skill necessary for a crew of five men to transport cocaine on the high seas takes skill and experience. Engaging in a journey that will take days and requires navigating hundreds of miles on the ocean takes extensive preparation. Defendants relied on each other during this extended journey and worked together, utilizing their skill and acumen to try and achieve a significant reward – a payday.  When discovered by law enforcement, Defendants fled at a high rate of speed and executed numerous erratic maneuvers and turns to evade being stopped. During their flight they jettisoned numerous packages of cocaine. Committed to their flight, Defendants failed to stop after warning shots and only stopped when the Coast Guard shot out their outboard engines.  After taking into consideration the seriousness of the offense, including the level of skill and preparation required to transport approximately 703 kilograms of cocaine, and the remaining 3553(a) factors, the United States recommends 96 months' custody followed by 5 years' supervised release, no fine, and a $100 special assessment.

## II.     STATEMENT OF FACTS

### A. The Crime

On May 31, 2020, an unmanned aircraft system (UAS) detected three persons on a grey and white Go-Fast Vessel (GFV 1) approximately 365 Nautical miles (NM) southwest of Acapulco, Mexico in international waters. United States Coast Guard Cutter STRATTON was nearby and diverted to intercept GFV 1.  The UAS then acquired an additional 2 persons onboard a blue and white Go-Fast Vessel (GFV 2).



← GFV 1



GFV 2

GFV 2 was on a course to intercept GFV 1. The UAS observed the two Go-Fast Vessels rendezvous and transfer packages consistent with narcotics.

GFV UNK (TWON) meeting at rendezvous location with White GFV w/ Blue trim (later abandoned)

At sea transfer between GFV UNK (TWON) and White GFV w/ Blue trim (later abandoned)

The United States Coast Guard launched two smaller boats, with embarked Coast Guard law enforcement teams to intercept GFV 1 and GFV 2. As the Coast Guard smallboat arrived on scene with GFV 1 and GFV 2 while they were exchanging packages, the defendants on GFV 2 jumped onto GFV 1, and GFV 1 began to flee. GFV 2 was left abandoned.



Still frame from UAS video of CGC STRATTON's Long Range Interceptor approaching GFVs during at sea transfer

GFV UNK (TWON) underway at high speed after observing approaching LE asset. White GFV w/ Blue trim is abandoned

The Coast Guard pursued fleeing GFV 1 with all five defendants onboard. Defendant 1, Javier De Jesus Saturno Paz, was driving GFV 1. The Coast Guard ordered the Defendants to stop and energized its blue light and sirens, but the Defendants continued to flee. The Coast Guard then fired warning shots, which the Defendants ignored and continued to flee at a high rate of speed. The Coast Guard observed GFV 1 execute multiple tactics to evade law enforcement, including erratic maneuvering, J-turns, and corkscrew turns. During one corkscrew turn the Defendants jettisoned multiple packages of cocaine over the side of GFV 1 and into the water, which were recovered by the Coast Guard. The Coast Guard recovered approximately 80 packages that were jettisoned.



Cocaine recovered from jettison by GFV 1

The Coast Guard waited until the corkscrew turn was completed, and then moved alongside GFV 1 and shot out the outboard engines on GFV 1, using disabling fire to force the defendants to stop.



Left: Slug entry and exit sites on twin 250 HP outboard engines.

Right: Boarding team uncovers contraband after cutting the deck of abandon delivery vessel.

Once GFV 1 was stopped, the Coast Guard conducted a Right of Visit boarding and identified the five defendants in this case as the five people onboard GFV 1. D1, Javier De Jesus Saturno Paz, claimed to be the master of GFV 1 and claimed Mexican nationality for the vessel. The Coast Guard enacted the US/Mexico NAMSI to NAMSI SOP and conducted a forms exchange with Mexico. Mexico could neither confirm nor deny the nationality of GFV 1, so it was treated as without nationality and subject to U.S. jurisdiction. The Coast Guard did not find any additional packages of cocaine on GFV 1.

A Coast Guard boarding team also conducted a boarding of GFV 2, which was abandoned when all defendants transferred to GFV 1 to flee from the Coast Guard. Upon embarking GFV 2, the Coast Guard noticed kilogram sized packages on the deck and an access hole cut into the deck of GFV 2. During a search, the Coast Guard discovered additional packages of cocaine hidden under the deck of GFV 2. The packages had the same appearance and markings as the packages recovered from the jettison by the Defendants on GFV 1. There were approximately 530 kilograms of cocaine on GFV 2. The Coast Guard recovered a total of approximately 703 kilograms of cocaine.



Contraband located underneath deck of abandoned GFV

Post-Arrest the Defendants provided various statements. Ultimately, agents discovered Defendant 1 (SATURNO PAZ), defendant 3 (GALLARDO) and defendant 4 (PEDRAZA) departed on GFV 1 from Mexico. They then rendezvoused with defendants 2 (VINCES) and 5 (PEREZ) on GFV 2 for an at sea transfer of the cocaine. If successful, the Defendants on GFV 2 and all its cocaine was supposed to be brought back on GFV 1 to Mexico, and GFV 2 would be sunk at sea. Defendants took turns driving the go-fast vessel that they were on.

### B. Defendants Statements

During his post arrest SATURNO PAZ admitted to knowingly transporting cocaine for a payment of approximately $500,000 pesos. He was given $1,000 pesos as advance payment. SATURNO PAZ stated that GFV 1 left from a beach near the mangroves in Mexico. He was provided with fuel, a GPS, and 2 satellite phones and was supposed to use them to navigate and communicate. The GPS he was given had saved coordinates located approximately 300 nautical miles out to sea. He confirmed he took turns driving GFV 1 with defendant 3 (GALLARDO) and defendant 4 (PEDRAZA). It took GFV 1 two days to arrive to the rendezvous location. When GFV 1 and GFV 2 met, the defendants tied the vessels together so they could transfer the packages. The Ecuadorian crewmembers, Defendants 2 (VINCES) and 5 (PEREZ), accessed the cocaine on GFV 2 through an opening in the deck. Defendants loaded approximately 50 to 100 bales of cocaine onto GFV 1 in approximately five minutes before they saw the Coast Guard and decided to flee and then jettison the cocaine during their flight.

During his post-arrest interview VINCES admitted to knowingly transporting drugs for a payment of approximately $5,000. He claimed he was recruited by a Colombian man, knew he would be transiting on a boat to Mexico, and that initially he tried to negotiate a better price for the job transporting the cocaine. He was driven from his hometown of Manta, Ecuador to Esmeraldas, Ecuador where he was taken to GFV2 and met PEREZ who was already in the GFV. They were told the cocaine was hidden underneath the floor of the GFV and were transported into the mangrove forests in

Colombia on the vessel before then departing for their open ocean transit. VINCES was primarily responsible for using a small radio on the GFV to communicate with refueling vessels that they met up with along their journey. They rendezvoused with refueling vessels approximately five times during their journey, and each time provided the codename for their vessel. After the fifth refueling, they rendezvoused with the Mexican defendants on GFV 1. Together all the defendants started to break open the floor of GFV 2 to remove the cocaine. While removing and transferring the cocaine to GFV 1, the Defendants saw the Coast Guard and decided to flee. They fled for approximately 30 minutes to an hour until the Coast Guard shot out their engines. VINCES admitted to one previous drug smuggling attempt in 2015, when he was supposed to transport drugs using a go fast vessel in the Eastern Pacific Ocean to Guatemala and was boarded by the Coast Guard. During that journey he and others jettisoned the drugs into the water and were released by the Coast Guard without prosecution since they did not find any drugs.

      During his post-arrest interview GALLARDO initially claimed that he was forced to smuggle drugs, but ultimately admitted to knowingly transporting drugs for money. GALLARDO admitted that he departed from Mexico in GFV 1 with defendants SATURNO PAZ and PEDRAZA. They traveled west approximately 300 nautical miles and then rendezvoused with the defendants in GFV 2 at prerecorded coordinates preloaded into the GPS device on their vessel. Defendants removed packages of narcotics from GFV 2 and placed them in GFV 1. During the exchange of the narcotics, they saw the Coast Guard and all Defendants on GFV 2 jumped onto GFV 1 to flee. GALLARDO, along with the other Defendants, jettisoned the narcotics packages during their flight until they were forced to stop by disabling fire from the Coast Guard.

      During his post-arrest interview PEDRAZA confirmed he was a fisherman from Mexico, but then ceased the interview.

      During his post-arrest interview PEREZ admitted to knowingly transporting cocaine for a payment of approximately $5,000 in advance and additional money if he successfully completed the journey. He was taken from his home of Manta, Ecuador to

Esmeraldas, Ecuador where he boarded GFV 2 and met defendant VINCES. The cocaine was hidden under the floor of GFV 2. He confirmed that they were provided with a small radio which they were supposed to use to communicate and rendezvous with refueling vessels. He estimated they refueled approximately four times. PEREZ estimated that it took approximately five or six days to complete the journey. PEREZ claimed VINCES was the captain of GFV 2. After the final refueling stop, they traveled for approximately fifteen hours before rendezvousing with the defendants in GFV 1 and then began to remove the cocaine from underneath the false floor and transfer it to GFV 1. PEREZ confirmed he was on GFV 2 when the Coast Guard arrived and jumped onto GFV 1 to flee from them. He estimated they fled for approximately 30 minutes before the Coast Guard forced them to stop. Records reveal PEREZ was previously involved in a 2006 seizure of approximately 4,000 kilograms of cocaine in Guayaquil, Ecuador.

### III. THE GUIDELINES

#### A. Calculation

Under USSG § 2D1.1 (c)(1), the base offense level is 38. The United States is not recommending any enhancements nor any reductions for role. The United States is recommending a two-level enhancement for reckless endangerment during flight based on fleeing from the Coast Guard. There is a two-level downward departure for safety valve and a three-level downward departure for acceptance of responsibility. Defendant is in Criminal History Category I. The resulting guideline range is 168 to 210 months in custody. Pursuant to the plea agreement the United States is recommending 96 months in custody for each Defendant - a substantial variance of 72 months or approximately a forty percent reduction of the low end of the guideline range.

#### B. Government Recommendation

Several factors justify the Government's recommendation. First, Defendant pled guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel. Maritime drug smuggling is a complicated endeavor. The evidence demonstrates the defendants coordinated an at sea voyage spanning hundreds of nautical miles to transport a vast

amount of cocaine valued at millions of dollars. Transporting cocaine on the high seas takes considerable skill and experience. That skill promised a significant reward. For Defendants that reward was monetary.

Additionally, in this case Defendants took every effort to evade law enforcement and spoliate potential evidence. They failed to stop when the Coast Guard approached, and fled for an extended period of time, executing erratic and dangerous maneuvers to prevent being stopped, and jettisoning bales of cocaine. Through the choices Defendants made to flee from law enforcement and jettison the cocaine, they recklessly created a substantial risk of death or bodily injury both to themselves, and to the Coast Guard officers who were pursuing them. But for the skill, training, and acumen of the Coast Guard the defendants very well could have caused serios injury during their flight which resulted in the need to use both warning shots and disabling fire, and they might have successfully evaded prosecution.

Second, this was a complicated smuggling venture for which Defendants preparation, expertise, experience, and efforts were critical. Each acted as more than a mere drug courier which this district often encounters for sentencing in land based drug smuggling ventures. Maritime smuggling requires specialized skills, and men like Defendants are recruited because of their familiarity with the maritime environment. That required skill is evident in this case, where Defendants were discovered hundreds of miles from their home countries. Arriving to the interdiction location, over 300 NM from Mexico, required each to prepare to be away from home for an extended period of time, to help navigate the vessel over a multi-day journey spanning hundreds of miles, and complete a complicated at sea vessel rendezvous. Over this extended time each was required to deal with all the difficulties that navigating on the high seas brings, including weather, sea state, and difficult communications. This requires expertise and experience and cannot be performed by just anyone. Unlike a simple drug courier who may only be responsible for drugs for a few hours and a few miles during a border crossing, this journey required Defendants to be responsible for the cocaine for hundreds of miles and days.

Third, the United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate in this case. The United States is not arguing for a navigator enhancement. Defendants took turns navigating and driving the GFV. Defendants operated as a team, utilizing tremendous skill, training, and acumen as discussed. All five were literally stuck in the same small boat, and equally culpable. Each Defendant is not less culpable than the average participant—let alone *substantially* less culpable. Defendants also understood the scope of this crime, each was to rendezvous with a vessel which had cocaine, transfer it to another vessel, and transport it back to Mexico. Defendants were involved in planning for and preparing for the criminal activity. As one of five men on this vessel in the middle of the high seas each was in control of the vessel. Finally, Defendants stood to benefit from the criminal activity, and engaged in this crime for financial reasons.

Fourth, Defendants were responsible for trafficking an astounding amount of cocaine – 703 kilograms. While Defendants may claim each did not intend to come to the United States, the role in transporting the cocaine in the GFV was critical to the success of the trafficking venture and it was foreseeable the cocaine was bound for the United States. During a maritime drug smuggling venture the value of the drugs, and potential profit, increases exponentially. Had this cocaine successfully made it to the United States it would have been worth tens of millions of dollars. There is no doubt that had this highly dangerous drug successfully made it to the United States it could have led to extensive harm.

Fifth, given the need to generally deter others, it is essential the sentence reflects the seriousness of this offense and the potential harm from trafficking cocaine on the high seas. Only a significant sentence will discourage future potential traffickers from engaging in similar crimes. The incentive to make relatively large sums of money for trafficking drugs must be combated with the deterrence of significant sentences for engaging in this criminal activity. This is highlighted by Defendants explanation that the motive to participate in the instant offense was monetary. There is a need to impose a sentence that adequately deters others from engaging in this criminal activity for the hopes of financial reward.

Sixth, the substantial variance already recommended by the United States appropriately accounts for any variances based on the history and characteristics of the defendant or COVID-19. Defendants were entrusted to smuggle approximately 703 kg of cocaine hundreds of miles while operating far from land with some autonomy. When discovered by law enforcement, they chose to flee and did everything they could to evade capture by abandoning the cocaine, jettisoning the cocaine, and executing erratic turns, placing both themselves and law enforcement in danger. Their sentence should reflect their extensive culpability.

## C. Conclusion

Based on the 3553(a) factors a custodial sentence of 96 months, followed by 5 years' supervised release, no fine, and a $100 special assessment is appropriate for each of the Defendants.

DATED: November 27, 2021                     Respectfully submitted,

                                             RANDY S. GROSSMAN
                                             Acting United States Attorney

                                             /s/ Nicole E. Bredariol
                                             Nicole E. Bredariol
                                             Special Assistant U.S. Attorney